OPINION OF THE COURT
Carmine A. Ventiera, J.
This proceeding, involving the management and disposition of substantial proceeds derivable from the sale of literary and other rights to the "Son of Sam” tragic events, presents serious issues that are not resolvable by mere reading of the controlling statute as amended, nor is there instructive legal precedent for determination of the issues.
The successor conservator has by virtue of her commendable efforts succeeded in obtaining a contract with Lawrence David Klausner (Author) and McGraw-Hill Book Company (Publisher) for publication of the story of David Berkowitz (as yet untitled) wherein the Publisher will advance the sum of $250,000, payable $125,000 on the signing of the contract with this court’s approval, $62,500 on March 31, 1979, and $62,500 on delivery of a manuscript acceptable to the Publisher. The estimated royalties may exceed the advance payment.
In the application presently pending before the court, the conservator seeks approval and authority to execute contracts with the Author, Publisher and a collateral agreement with Jultak & Stern, the former attorneys for Berkowitz.
There is an unanimity of consent among the parties for the execution of contracts with the Publisher and Author in order to secure the monetary windfall from the public’s base delight in the ghoulish recounting of the "exploits” of "Son of Sam” the ".44 caliber killer”. However, there is strong opposition to the conservator’s receipt and administration of the funds from the Publisher and the Author, and to the unconditional payment to Jultak & Stern for their services in the overall "Production”. .
Historically, the New York Legislature and the Legislatures of our sister States enacted a new statutory concept of aid to victims of crimes. The aid is furnished by the State and is administered by the State board pursuant to defined procedures. In this State the new act is entitled "Crime Victims Compensation Board” (Board) and is article 22 of the Executive Law. Understandably, the amount of the aid is limited.
*825 The sophistication of our society has embellished the field of entertainment to the extent that reading of the "exploits” becomes an acceptable substitute for "live performances in the Roman arena” — witness the mad rush of publishers to obtain the literary and motion picture rights to the last days of the condemned murderer who preferred death by execution to life imprisonment. With such an atmosphere of public "beneficence” to the criminal, the Legislature, shocked by the large numbers of vicarious thrill seekers and by the media trumpeting forth each little Berkowitz happening, hastened to debar Berkowitz and others from profiting from their heinous misdeeds.
Section 632-a of the Executive Law, conceived in haste, written in haste, and declared under the cry of the public for the Legislature to exact retribution, reflects its noble spirit, though clothed in loose, vague and inconsistent language.
Fortunately, as noted by the Appellate Division, Second Department, in Barrett v Wojtowicz (66 AD2d 604), the statute was amended to remove the inconsistency as to when an action may be brought thereunder. The Appellate Division meticulously hewed to the issue before it and ventured no obiter with respect to the other portions of the section. However, it did note (p 611) that the legislative jacket contained a report stating "This bill is terribly drafted!! Its intent & objectives should be praised, but it should be vetoed with a promise to resubmit a bill which will (1) be clear [and] (2) have a chance of surviving a constitutional attack.” The same jacket contained a memorandum to counsel for the Governor reading in part: "Obviously, there are many holes in the proposal * * * Though it may be a little weak on details, the bill is certainly strong and definite as an expression of public policy. We believe the public policy is a good one and should be supported.”
This court in its research has found no counterpart to section 632-a of the Executive Law in any of our sister States, nor any legal precedents, other than the Barrett case (supra) wherein the court limited itself to the one issue of limitation of time for the commencement of an action under the statute. To construe and apply the relevant provisions of the statute to the problems presented to this court in administering the funds receivable on the sale of the literary rights, the court will observe and rely on the guidelines of constitutional construction.
*826 The conservator’s attack on the constitutionality of the statute and its provisions with respect to the payments to be received and the deposit thereof in an escrow account centers on the looseness of the language, its vague and undefined scope, yet limited umbrella coverage, and its retroactive effect on the property rights of Berkowitz. However, the conservator’s attack is an alternative position to be advanced and to be considered only if the court’s determination is adverse to the relief sought by the conservator.
This court will hallow the commands that a "statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score” (United States v Jin Fuey Moy, 241 US 394, 401); that "Legislative enactments are presumed to be constitutional, i.e., they are presumed to be supported by facts known to the Legislature * * * [and that] we must be guided by the familiar principle that 'it is only as a last resort’ that courts strike down legislative enactments on the ground of unconstitutionality” (Wiggins v Town of Somers, 4 NY2d 215, 218-219, mot for lv to rearg den 4 NY2d 1046); that "The cardinal principle to be applied in the construction of statutes is to ascertain and give effect to the intention of the Legislature whenever possible” (Wilson v Board of Educ., 39 AD2d 965, 966, mod 32 NY2d 636); that "A statutory enactment must be read in the light of its history and purpose * * * and that construction is to be preferred which furthers the object, spirit and purpose of the statute” (Schuyler v South Mall Constructors, 32 AD2d 454, 455); that "The purpose cannot be defeated or thwarted by selecting and isolating sentences of the statute which seem inharmonious with it. A statute must receive such reasonable construction as will, if possible, make all its parts harmonize and render them consistent with its scope and purpose” (Price v County of Erie, 221 NY 260, 266); that "The literal language of a statute will not always be controlling where it contravenes the legislative intent or leads to an unreasonable result” (Le Drugstore Etats Unis v New York State Bd. of Pharmacy, 33 NY2d 298, 302); that "We will not blindly apply the words of a statute to arrive at an unreasonable or absurd result” (Williams v Williams, 23 NY2d 592, 599) and will observe the teaching that "the letter killeth, but the spirit giveth life.” (2 Corinthians, ch 3, verse 6.)
To better comprehend the contested provisions and capture *827 the spirit, intent and purpose of the statute, examination and analysis thereof should be done in the context of the specific circumstances existent and applicable to Berkowitz.
Berkowitz, being under a legal disability, is not in a position to reap and dissipate moneys receivable on the "reenactment” of his crimes, "by way of a movie, book, magazine article, * * * radio or television presentation”. (Executive Law, § 632-a, subd 1.) The Board is not constituted, statutorily empowered or capable of generating negotiating and consummating a contract granting literary, dramatic, motion picture, etc., rights for a consideration. It may only receive "moneys which would otherwise, by terms of such contract, be owing to the person so accused or convicted or his representatives * * * [and] shall deposit such moneys in an escrow account for the benefit of and payable to any victim * * * of any crimes committed by: (i) such convicted person”. (Executive Law, § 632-a, subd 1.) Berkowitz, unlike those convicted of crimes referred to in the statute, is similarly unable to negotiate and sell any of his valuable literary, motion picture, television, etc., rights. A conservator had been appointed for him on October 31, 1977, prior to his having pleaded guilty on May 8, 1978. The conservator has the requisite powers to create the fund for the Board to receive.
Though the Legislature did not specifically spell out the instrumentalities nor the modus operandi for the payment over of the royalties to the Board nor specifically provide for a case where the person convicted of a crime cannot act in his own behalf, nevertheless this court, in observing the constitutional guidelines, declares that inherent in the language of the statute, it is contemplated that the imprisoned convict, who is at all times subject to the jurisdiction of the court, shall have his rights controlled by the court, and that the instant case be deemed to have been included within the scope of the statute in order to further "the object, spirit and purpose of the enactment.” (Schuyler v South Mall Constructors, 32 AD2d 454, 455, supra.) None of the parties object to such inclusion and umbrella coverage by the statute. If, therefore, this court must act to capture the beneficent aims of the statute and promote its purposes, it can only do so through the conservator.
The conservator, as a statutory "receiver”, is "born by order of the court and * * * acts merely as its arm.” (Matter of Biker [Browne], 204 NYS2d 60, 62.) She is "an officer of the *828 court and subject at all times to its direction and control” (Alexander v Valumet Chocolate Co., 240 App Div 769, 770). The "court may be said to pledge its faith to carry out the engagements and contracts authorized by it” (Knickerbocker Ice Co. v Benson, 155 Misc 738, 740). The conservator "is clothed as an agent of the court, not of either, or all, of the parties” (Stier v Mar Operating Co., 58 Misc 2d 407, 408, mod 33 AD2d 816).
The contract of sale of the literary rights to the "exploits” of "Son of Sam” — ".44 Caliber Killer”, if approved by the court, is a contract of the court and not of Berkowitz or of the Board. It is the court’s "pledge [of] its faith to carry out the engagements” by "its arm”, its "officer” who will be "subject at all times to its discretion and control” and who will be its "agent”, "not of either or all, of the parties.” The funds created by the court through its agent must be subject to this court’s jurisdiction and control. The court’s agent has no stake in the fund, cannot personally profit from the contract, and may only receive such compensation for her services as fixed by the court in accordance with statute. She must not, therefore, be exposed to a substantial potential liability for failure, as a fiduciary, to report to the Internal Revenue the royalties payable under the contract. Whether the Berkowitz estate may or may not be liable under the income tax laws for such "income” devoted to payment of crime victims’ claims is not an issue for determination by this court. However, the court must be alert to the possible tax obligations.
The statement made by the Attorney-General’s office that if petitioner-conservator does not wish to act under these circumstances, then an application will be made for the appointment of another conservator, does not dispose of the issue of tax liability. Similarly, the statement of an objectant that direct payment to the Board may be a means of obviating reporting to the Internal Revenue and avoidance of tax liability is not one to which this court can subscribe, nor be a party to or consider. If, in fact, a tax is payable, this court may not lend its judicial imprimatur to an attempt at avoidance. Moreover, objectant’s proposal creates no exemption for a fiduciary-conservator to report royalty payments to the Internal Revenue.
For this court to rule as requested, this court will be setting a precedent for all similar cases without regard to those where the royalties may exceed the claims of the victims. *829 When and at what late date are such excess funds to be reported to the Internal Revenue? What will then be the tax liability and penalties for the failure of a conservator to have earlier reported the income? Who is then to pay those tax liabilities and penalties if the excess funds are not sufficient? Should it be the fiduciary-conservator who failed to make the report? Is that not a most odd, unreasonable, and absurd result, that could not have been contemplated by the Legislature?
The jurisdiction of this court does not end with the appointment of a conservator, nor with the approval of the contracts of the conservator. For then, what of the "pledge [of] its faith to carry out the engagements and contracts authorized by it”. (Knickerbocker Ice Co. v Benson, 155 Misc 733, 740, supra.) The royalties payable under the contract must be so paid that the court shall have jurisdiction thereover for their proper administration and payment over to the Board. The payment must, therefore, be to the conservator, the agent of the court.
The conservator is not embraced by the descriptive word "representative” of "any person * * * convicted of a crime” (Executive Law, § 632-a, subd 1), but is in fact a representative of the court accountable only to the court. Her accounts will be supervised and audited by a special referee appointed by the Appellate Division (see Mental Hygiene Law, §§ 77.29, 78.23, 78.25). The conservator is appointed for a specific purpose for a specific fixed period of time and only so long as the functions for which the conservator has been appointed have been served. Thus, when the tax problems have been determined, the court then presiding may on its own motion determine that the need for a conservator has ended and order direct payments to the Board.
However, so long as the aid and jurisdiction of the court is required to effectuate the purposes of the statute, the office and functions of the conservator must continue. This conclusion is not contrary to the language of the statute when it directs that "Every person, firm * * * or other legal entity contracting with any person or the representative or assignee of any person, accused or convicted of a crime in this state * * * [shall] pay over to the board any moneys which would otherwise, by terms of such contract, be owing to the person so accused or convicted or his representatives.” (Executive Law, § 632-a, subd 1.) The court is not a representative or assignee of Berkowitz, nor is the conservator, the court’s *830 "arm”, such a representative. The quoted language of the statute may not be so literally construed as to destroy the effectiveness of the statute. It would be transgressing the proscription against "blindly applying] the words of [the] statute to arrive at an * * * absurd result” (Williams v Williams, 23 NY2d 592, 599, supra) and completely failing to seize the beneficence of the statute; particularly, when a simple construction of considering the court and the Board as a unity and as parts of the governmental structure bridging the gap so that the funds can be transported from one arm of the government to the other. The "many holes in the proposal” are thus avoided. The court, by the foregoing construction, fully adopts the Legislature’s "expression of public policy * * * [which] is a good one and should be supported.”
This court declares section 632-a of the Executive Law constitutional and as encompassing (a) the office of a conservator for one under a legal disability, unable to act for himself (Berkowitz); (b) the jurisdiction of the court over the "moneys which would otherwise, by the terms of such contract, be owing to the person so * * * convicted” (Executive Law, § 632-a, subd 1); and (c) the stewardship of the conservator to bridge the gap between payment by the publisher and turnover to the Board.
Accordingly, the court grants the petition of the conservator.