724 F.Supp. 170 (1989)
SIMON & SCHUSTER, INC., Plaintiff,
v.
MEMBERS OF the NEW YORK STATE CRIME VICTIMS BOARD, Gennaro Fischetti, George L. Grobe, Jr., Diane *171 McGrath, and Angelo Petromelis, individually and in their official capacities, Defendants.
No. 87 Civ. 5582 (JFK).
United States District Court, S.D. New York.
October 26, 1989.
Ronald S. Rauchberg, Charles S. Sims, Proskauer Rose Goetz & Mendelsohn, John C. Bender, Elizabeth A. McNamara, Simon & Schuster, Inc., New York City, for plaintiff.
Robert Abrams, Atty. Gen. of the State of N.Y., New York City (Harvey J. Golubuck, Howard L. Zwickel, Anne S. Haskell, of counsel), for defendants.
Henry Mark Holzer, Brooklyn Law School, Brooklyn, N.Y., Daniel J. Popco, Michael P. McDonald, Washington Legal Found., Washington, D.C., amici curiae, for Washington Legal Found., et al.
Arthur Eisenberg, New York Civ. Liberties Union, Leon Friedman, New York City, amicus curiae, for the New York Civ. Liberties Union.
*172 Irwin Karp, Port Chester, N.Y., amicus curiae, for Volunteer Lawyers for the Arts, Inc.
Weil, Gotshal & Manges, New York City (R. Bruce Rich, Robin E. Silverman of counsel), amicus curiae, for the Ass'n of American Publishers, Inc.

OPINION AND ORDER
KEENAN, District Judge:
Before the Court are plaintiff's motion and defendants' cross-motion for summary judgment. Fed.R.Civ.P. 56. Plaintiff Simon & Schuster, Inc. ("Simon & Schuster") seeks an order declaring that New York Executive Law section 632-a violates the First and Fourteenth Amendments to the United States Constitution. The Court has heard oral argument on these motions and has received numerous briefs of amici curiae.

Background
At issue in this action is New York Executive Law section 632-a, commonly referred to as the "Son of Sam" law. Enacted in 1977, the purpose of section 632-a is to prevent those accused or convicted of a crime from profiting from the commercial exploitation of their crimes by contracting for the production of books, movies, magazine articles, television shows and the like in which their crime is reenacted or in which the "person's thoughts, feelings, opinions or emotions" about the crime are expressed.
The facts of this case are undisputed. In 1980, career criminal Henry Hill was arrested and charged with six counts of conspiracy to sell drugs. In 1980, Hill began to cooperate with the Government and was put into the Federal Witness Protection Program. In 1981, Simon & Schuster began efforts to publish a book with Hill's cooperation, which would provide an inside look at organized crime in New York City. Simon & Schuster's Editor in Chief, Michael Korda, contacted the Sterling Lord Agency ("Sterling Lord"), a literary agency in New York, to find an author for such a book. The parties obtained the services of Nicholas Pileggi, a well-known author who had previously written magazine articles on organized crime and municipal corruption. On August 21, 1981, Pileggi, Hill and Sterling Lord entered into a written agreement for the creation of the book. On September 1, 1981, Simon & Schuster, Pileggi and Hill entered into a publishing agreement ("the Contract") for an autobiographical non-fiction work based on organized crime in New York City. Simon & Schuster was to pay money to Sterling Lord for the benefit of Pileggi and Hill, and the money was to be divided between Pileggi and Hill. Sterling Lord was to receive 10% of the money paid to Pileggi and Hill. The result of these transactions was Wiseguy: Life in a Mafia Family, which was published in January 1986 and which subsequently appeared on several best-seller lists.
By letter dated January 31, 1986, defendant the New York State Crime Victims Board ("the Board") directed Simon & Schuster to provide it with a copy of the Contract and to suspend payments to Sterling Lord. Simon & Schuster complied. On June 15, 1987, the Board served on Simon & Schuster a Proposed Determination and Order and informed Simon & Schuster of their right to a hearing. No hearing was requested by Simon & Schuster,[1] and the Proposed Determination and Order became final on July 15 1987.
The Order concluded that Wiseguy was subject to the regulations promulgated in section 632-a, because the book contained Hill's thoughts, feelings, opinions and emotions about and admissions to his participation in criminal activities. The Board described Wiseguy as
Henry Hill's life story from 1955 when he first became involved with organized crime until May 1980 when he joined the Federal Witness Protection Program. It is a veritable catalog of crimes in which Henry Hill admits to the commission of *173 various crimes and expresses his feelings, opinions or emotions regarding such crimes.
Plaintiff's Notice of Motion, Exh. 2, ¶ 11. As a result of its review, the Board found that Simon & Schuster had violated section 632-a; a copy of the Contract should have been turned over to the Board at the time of execution for its determination as to the applicability of section 632-a. The Board found that Pileggi was a co-author, not a representative of Hill, thus he was not subject to section 632-a. Sterling Lord was found, however, to be an agent of Hill and therefore a representative under section 632-a, and was ordered to turn over to the Board its 10% share of Hill's proceeds. The Board also ordered Hill to turn over to its escrow account any money paid to him by Simon & Schuster through Sterling Lord, totaling $96,250.00. If Hill failed to turn over the money, Simon & Schuster was ordered to pay that amount to the Board. In addition, Simon & Schuster was ordered to turn over all outstanding money payable to Hill, including any future royalties payable to Hill or his representatives under the Contract.
Plaintiff then brought this action seeking declaratory and injunctive relief, asserting that section 632-a violates the First Amendment guarantee of freedom of speech and is unnecessarily vague and overbroad in violation of the Fourteenth Amendment. Plaintiff further alleges that section 632-a impairs its ability to undertake publishing contracts that arguably fall within the statute's reach. The statute thus has a chilling effect in that books concerning crime, about which the public has a right to know, will not be published. In addition, plaintiff argues that section 632-a affects editorial decisions and will result in self-censorship of certain subjects.

Discussion

A. Legislative History of Section 632-a

The legislative history of section 632-a has been thoroughly recounted in Barrett v. Wojtowicz, 66 A.D.2d 604, 414 N.Y.S.2d 350 (2d Dept.1979), and will be summarized for purposes of this discussion. New York Executive Law, Article 22, sections 620-635, was enacted in 1966 and is entitled "Crime Victims Board." Section 620 contains a "Declaration of policy and legislative intent," which reads as follows:
The legislature recognizes that many innocent persons suffer personal physical injury or death as a result of criminal acts. Such persons or their dependents may thereby suffer disability, incur financial hardships, or become dependent upon public assistance. The legislature finds and determines that there is a need for government financial assistance for such victims of crime. Accordingly, it is the legislature's intent that aid, care and support be provided by the state, as a matter of grace, for such victims of crime.
Section 622 creates a Crime Victims Compensation Board, section 623 delineates the powers of the Board, and section 629 provides the method for judicial review of the Board's decisions. Rules and regulations promulgated by the Board are set forth in Title 9 of New York Code of Rules and Regulations, Parts 525, 526 and 527.
Section 632-a was enacted in 1977 and is entitled "Distribution of Moneys Received as a Result of the Commission of a Crime." Section 632-a provides that any payments made to a criminal pursuant to a contract for the reenactment of his or her crime through a movie, book, magazine article, tape recording, phonograph record, radio or television presentation, or from the expression of such accused or convicted person's thoughts, feelings, opinions or emotions regarding such crime, be put into escrow for five years. Victims of the reenacted crime are then given five years from the creation of the escrow account in which to bring a civil action and recover a money judgment against the criminal or his representatives. See Barrett, 66 A.D.2d at 615, 414 N.Y. S.2d at 357. The money is held in escrow in order to ensure that the assets are preserved and that the victim's money judgment will be satisfied.
The motivation behind the enactment of section 632-a was the highly publicized sale by David Berkowitz, the "Son of Sam" *174 serial killer, of the exclusive rights to the story concerning his crime. The bill's sponsor, New York State Senator Emmanuel R. Gold stated,
It is abhorrent to one's sense of justice and decency that an individual, such as the forty-four calibre killer, can expect to receive large sums of money for his story once he is captured  while five people are dead, other people were injured as a result of his conduct. This bill would make it clear that in all criminal situations, the victim must be more important than the criminal.
N.Y.Legis.Ann., 1977, at 267. See Riggs v. Palmer, 115 N.Y. 506, 22 N.E. 188 (1889) (old maxim that no one should be permitted to profit from his own crime).
It is no secret that section 632-a was enacted in hasty response to the public outcry that ensued after the David Berkowitz sale was publicized. See Matter of Johnsen, 103 Misc.2d 823, 824, 430 N.Y. S.2d 904, 906 (1979). The statute has, however, been amended since its enactment. In 1978 and 1981 section 632-a was amended to clarify substantive ambiguities. L.1978 ch. 417, eff. Sept. 1, 1978; L.1981 ch. 445, eff. July 7, 1981. See Barrett, 66 A.D.2d at 611-12, 414 N.Y.S.2d at 355. And in 1986 the legislature again made amendments to correct spelling errors and to revise subsection 11, which provides for priority of payments from the escrow account. L.1986, c. 74, § 6.
To date, some twenty-nine other states have enacted legislation restricting revenue from crime-related books and movies. The majority of these laws are modeled after section 632-a. See 60 ALR 4th 1210, § 2 (listing Alabama, Alaska, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Kentucky, Louisiana, Massachusetts, Minnesota, Ohio, Oklahoma, Michigan, Nebraska, Nevada, New Jersey, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Washington and Wisconsin). In addition, state courts in New York and New Jersey have upheld the constitutionality of "Son of Sam" laws. See In the Matter of Application of Children of Bedford, Inc., 541 N.Y. S.2d 894 (Sup.Ct.1989); Matter of Johnsen, 103 Misc.2d 823, 430 N.Y.S.2d 904 (1979); Fasching v. Kallinger, 211 N.J.Super. 26, 510 A.2d 694 rev'd on other grounds, 227 N.J.Super. 270, 546 A.3d 1094 (1988).
The fact that section 632-a and an analogous "Son of Sam" law have been found constitutional by some courts and that section 632-a has served as a model for a large number of states is indicative of the law's general acceptance in this country's legislatures and courts. Its acceptance, however, is not dispositive of its constitutionality. It is helpful to defendant's position, however, that at this time the interpretation of section 632-a is not in disarray. In addition, both parties to this action agree that the law's purpose, the compensation of crime victims, is a good one and should be furthered. The question before this Court, then, is whether this particular law is the proper method to further that purpose, and if so, whether this law is constitutional on its face and in its application.

B. First Amendment

Plaintiff asserts that section 632-a imposes unconstitutional restrictions on authors and publishers of books on crime. Plaintiff contends that section 632-a is content-based, speaker-based, that the press gets differential treatment under the statute, and that section 632-a forces editors to alter books in order to avoid the statute's restrictions, thus resulting in self-censorship. Finally, it is urged that publishers are unlawfully required to seek prior review from governmental officials before accepting a book for publishing. Plaintiff thus submits that section 632-a imposes impermissible restrictions on the First Amendment's guarantee of free speech and therefore must meet a test of strict scrutiny. The strict scrutiny test requires a showing of compelling state interest and a law narrowly tailored to fit that interest. Plaintiff argues that the mere fact that the law was passed for a beneficent purpose, compensating crime victims, does not fulfill the strict scrutiny test.
*175 The Board responds that section 632-a does not implicate freedom of expression and that the First Amendment is not implicated at all. Accused or convicted criminals are free to write, but they are unable to directly receive profits. Section 632-a thus regulates the author's non-expressive activity rather than prohibits the author's expression. Finally, the Board asserts that the law imposes only an indirect burden on the press' ability to publish or upon an individual's decision to express his views. The Board thus submits that it is acting within constitutional restraints under section 632-a.
The Court is acutely aware of its responsibility to afford great deference to the state legislature in its law-making function. As the Supreme Court has directed, "In exercising its power to review the constitutionality of a legislative Act, a federal court should act cautiously. A ruling of unconstitutionality frustrates the intent of the elected representatives of the people. Therefore, a court should refrain from invalidating more of the statute than is necessary." Regan v. Time, Inc., 468 U.S. 641, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984). This caution is tempered, however, by the Supreme Court's recognition that with legislation concerning First Amendment freedoms "precision of drafting and clarity of purpose are essential." Erznoznik v. City of Jacksonville, 422 U.S. 205, 95 S.Ct. 2268, 2277, 45 L.Ed.2d 125 (1975). See also Sable Communications of California, Inc. v. Federal Communications Commission, ___ U.S. ___, 109 S.Ct. 2829, 2838, 106 L.Ed.2d 93 (1989) ("Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake." (quoting Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 98 S.Ct. 1535, 1543, 56 L.Ed.2d 1 (1978)).
The Court must first determine whether the effect of section 632-a is to restrict expressive activity or whether its effect is merely to regulate the proceeds of that expressive activity.[2] Once this determination is made, the Court must then decide whether to apply a standard of strict scrutiny or a lesser standard in determining the constitutionality of section 632-a.
Simon & Schuster alleges that section 632-a has a restrictive impact on First Amendment interests, and that the effect is to inhibit or prevent the publication of works of major importance which involve the subject of crime.[3] Plaintiff submits affidavits of people involved in the publishing business who allege that section 632-a "interferes with the publishing and editorial decisions of publishers and writers, and diminishes the amount of protected expression reaching the reading public by deterring *176 the commissioning and publication of works to which it applies." Simon & Schuster Mem. at 14.
The Court recognizes that section 632-a does act as a procedural hurdle in the publishing process. Publishers may have to search harder for an accused or convicted criminal who is willing to sell his or her story without the promise of immediate payment. See Meyer v. Grant, 486 U.S. 414, 108 S.Ct. 1886, 1893, 100 L.Ed.2d 425 (1988) ("it is often more difficult to get people to work without compensation than it is to get them to work for pay"). But it is well accepted that freedom of speech "presupposes a willing speaker." Virginia State Board of Pharmacy, 425 U.S. at 756, 96 S.Ct. at 1822. Thus, although it may be more difficult for publishers and authors to create books with the cooperation of a criminal source, it is not impossible nor is such cooperation proscribed by section 632-a. The statute merely diverts the criminal source's proceeds for a time to ensure that victims may be compensated. See Children of Bedford, 541 N.Y.S.2d at 899.
In the instant case, Wiseguy was written, published and sold to thousands of readers. The Board's ruling occurred after the book's publication, resulting in the seizure of Hill's proceeds[4] and those received by Sterling Lord as Hill's representative. Pileggi and Simon & Schuster were permitted to retain their proceeds. Simon & Schuster suggests that had the Board reviewed the Contract before the book's publication, Hill never would have cooperated and thus the public would have been denied the opportunity to read this book. However, because Simon & Schuster failed to comply with section 632-a by presenting its Contract with Pileggi and Hill to the Board before making payments to Hill, we will never know whether or not Hill would have cooperated.[5]
In this regard, Simon & Schuster argues that publishers are unlawfully required to seek prior review from government officials before making payments under a publishing contract. The Court finds that the Board's review is not unlawful and that it does not prohibit expression. The Board merely determines whether section 632-a applies to a contract. It does not determine the newsworthiness or the educational value of a work. See Regan v. Time, Inc., 468 U.S. 641, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984) (regulation prohibited photographic reproductions of U.S. currency unless found to be of newsworthy or educational value); Erznonik v. City of Jacksonville, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) (ordinance prohibited showing of nude films at drive-ins); Carlin Communications, Inc. v. Federal Communications Commission, 749 F.2d 113 (2d Cir.1984) (scheme for blocking dial-aporn phone calls during certain hours found both under-inclusive and over-inclusive), cert. denied, ___ U.S. ___, 109 S.Ct. 305, 102 L.Ed.2d 324 (1988). Nor does section 632-a prohibit speech. See Consolidated Edison Co. v. Public Service Commission, 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980) (impermissible suppression of telephone bill inserts concerning controversial issues of public importance); Village of Schaumberg v. Citizens for a Better Environment, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980) (restrictions on charitable solicitations prevented persuasive speech on causes of economic, political concern); Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (limitations on expenditures by political candidates on own behalf restricted political speech); Daily Herald Co. v. Munro, 838 *177 F.2d 380 (9th Cir.1988) (statute unlawfully prohibited all exit polling).
In its surreply memorandum, Simon & Schuster argues that the Supreme Court's decision in Meyer v. Grant, 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988), "squarely reaffirms that a direct restriction on the ability to use non-governmental monies to pay for an activity is tantamount to a direct restriction on that activity, and must be scrutinized accordingly." Simon & Schuster Surreply Mem. at 5. Simon & Schuster stresses a quote from Meyer which at first glance appears to be quite helpful to plaintiff: "the prohibition against the use of paid circulators has the inevitable effect of reducing the total quantum of speech on a public issue." Id. 108 S.Ct. at 1892. A closer look at Meyer, however, shows that it is clearly distinguishable. At issue was a statute which permitted proposals for state constitutional amendments to be placed on the general election ballot if at least 5% of the total number of qualified voters signed a petition for the amendment. The statute, however, made it a felony to pay petition circulators. The Supreme Court held the statute unconstitutional in that it abridged the right to engage in political speech which is at the "core" of the First Amendment. Such a limitation on political expression subjected the statute to "exacting scrutiny." The statute thus operated directly to affect political speech. Here, section 632-a has no abridging effect on political speech. It merely functions to prevent criminals from capitalizing on their crimes.
The Supreme Court has recently found that "where speech and nonspeech elements are combined in the same course of conduct a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." Texas v. Johnson, ___ U.S. ___, 109 S.Ct. 2533, 2540, 105 L.Ed.2d 342 (1989) (emphasis added) (citing United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)). Section 632-a applies to situations in which speech and nonspeech elements are combined. Although it applies only to contracts with respect to the expression of the criminal's feelings about or recollection of his or her crime, the statute's reach is not prohibitive of the expressive activity. The effect is limited to the nonexpressive element of the activity: receiving a profit. Defendants correctly rely on Arcara v. Cloud Books, Inc., 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986), to illustrate this concept. In Arcara, an anti-prostitution statute was used to close a bookstore in which prostitution was being practiced. The bookstore owners argued that the First Amendment prohibited the store's closing because the statute burdened their book-selling activities. The Court noted that the booksellers were free to sell their books elsewhere and that "every civil and criminal remedy imposes some conceivable burden on First Amendment activities." 106 S.Ct. at 3177. See also Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue, 460 U.S. 575, 586, 103 S.Ct. 1365, 1372, 75 L.Ed.2d 295 (1983) (neither press nor booksellers may claim special protection from governmental regulations of general applicability simply by virtue of their First Amendment protected activities).
The state's interest in compensating crime victims is unrelated to the suppression of free expression and any burden on free expression is merely incidental. Section 632-a is not designed to suppress speech which it finds abhorrent or obscene, see Sable Communications, Inc., 109 S.Ct. at 2836, or that the community is simply hostile to. See Texas v. Johnson, 109 S.Ct. at 2541. The speech itself is not the target of section 632-a; the profit-making aspect is the target. It is not necessarily abhorrent to the public to read about Hill's activities as a mobster. To many, that is a source of interest and of news value. The clearly abhorrent and repulsive aspect is that with the admission of his crimes, Hill is able to profit. The Court finds that the statute does not reflect legislative hostility to the viewpoint of an author who writes about criminal activity. The only questions for the Board in its review of a publishing contract are:

*178 1. Is the speaker an accused or convicted criminal?
2. Does the book discuss the accused or convicted criminal's crime?
3. If the speaker is not accused or convicted, does the book contain admissions to the commission of a crime?
4. Does a victim(s) to the discussed crime(s) exist who could obtain a civil judgment against the speaker?
The Board does not employ a sliding scale to determine if the crime spoken of is more horrible than another. See Young v. American Mini Theatres, 427 U.S. 50, 67, 96 S.Ct. 2440, 2451, 49 L.Ed.2d 310 (1976). All crimes for which there are victims are covered by section 632-a. This purely objective inquiry illustrates the non-hostile functioning of section 632-a.
Simon & Schuster also argues that section 632-a is speaker-based. Plaintiff relies on clearly distinguishable cases. In First National Bank of Boston v. Bellotti, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), at issue was a Massachusetts statute that prohibited corporate bodies from making campaign contributions that would influence the vote on any question except one materially affecting the property, business, or assets of a corporation. The statute was held unconstitutional in that it prohibited certain speakers from expressing views on political issues. The Court held that "[i]n the realm of protected speech, the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue." Id. 98 S.Ct. at 1420. (citing Police Department of Chicago v. Mosley, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972)). In Bellotti, the statute prohibited corporate speakers from addressing the public on an issue of public concern, which is different from the instant case. Likewise, in Federal Communications Commission v. League of Women Voters, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984), the Supreme Court held unconstitutional a statute which forbade a noncommercial educational broadcasting station which receives a grant from the Corporation for Public Broadcasting to "engage in editorializing." The statute was held unconstitutional in that it acted as a ban on editorializing and thus violated the First Amendment. Once again, section 632-a does not ban speech; it does not evaluate the expressions of criminal speakers based on a subjective standard; and its purpose is not to prohibit or unduly burden the dissemination of a particular type of speech.
Based on the foregoing, the Court finds that section 632-a does not directly affect expressive activity and that it is directed at nonspeech activity. As a result, the Court need not apply a test of strict scrutiny to the statute. Instead, section 632-a is subject to the lesser standard of review as dictated by the Supreme Court in O'Brien. In O'Brien, the Supreme Court upheld a statute which criminalized the destruction of Selective Service certificates. The Court found that the destruction of the certificates was not expressive activity and that the statute was directed at nonspeech elements. The Court held that "a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms," and that the statute was constitutional if it had been enacted within the constitutional power of the government, furthers an important or substantial governmental interest unrelated to the suppression of free expression, and the incidental restriction on First Amendment freedom is no greater than is essential to that governmental interest. See O'Brien, 391 U.S. at 376, 88 S.Ct. at 1678. The standard in O'Brien is a lesser standard than the strict scrutiny test advocated by plaintiff, which requires that the statute serve a compelling interest and that the statute be narrowly tailored to achieve the government's goals.
Applying O'Brien to section 632-a, the Court finds first that the New York state legislature acted within its authority in enacting the statute. Both parties agree that victim compensation is necessary and that the most effective means of compensating crime victims should be developed. Related to this authority, then, is the important *179 governmental interest of victim compensation. The Court has determined that this interest is unrelated to the freedom of expression. As has been discussed, the interest in compensating victims does not involve suppressing speech, but merely attaching the proceeds of that speech for the benefit of the victim.
Finally, the Court finds that any incidental restriction on First Amendment freedom imposed by section 632-a is no greater than is essential for the government's interest in compensating crime victims. The law is drawn not to prohibit expressive activity, but to garnish the proceeds so that they will be used in a productive manner. The statute reaches only proceeds from expressive activity for the purpose of preventing a criminal from directly profiting from his or her crime. The Court thus finds that section 632-a withstands the O'Brien test and that it is not unconstitutional on its face nor as applied to plaintiff.

C. Fourteenth Amendment

Simon & Schuster also argues that section 632-a violates the Fourteenth Amendment in that it is overbroad and vague. Simon & Schuster asserts that "[t]he blunderbuss breadth of the statute and the resulting uncertainties" give the Board the power to make enforcement decisions "without clear, neutral standards." Simon & Schuster Mem. at 64. Plaintiff relies heavily on Board of Airport Commissioners of Los Angeles v. Jews for Jesus, Inc., 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987). At issue in that case was a resolution adopted by the Board of Airport Commissioners banning "all First Amendment activities" within the central terminal area at Los Angeles International Airport. The Supreme Court found the statute to be impermissibly broad in that its sweeping ban would prohibit virtually all protected expression. The Court found that every person in the airport conceivably could be held in violation of the statute and that "no conceivable governmental interest would justify such an absolute prohibition of speech." Id. 107 S.Ct. at 2572.
Plaintiff argues that Jews for Jesus is on point because section 632-a applies to "every" contract or payment "with respect to" the enactment of a crime in any medium regardless of how long ago the crime occurred, or the relative importance of the crime to the book. Simon & Schuster Mem. at 60. In addition, Simon & Schuster argues that the lack of clear standards gives the Board open-ended discretion in determining the enforcement of section 632-a.
The Court finds that plaintiff's reliance on Jews for Jesus is misplaced. The resolution at issue in that case was indeed sweeping, overbroad and subject to discretionary enforcement. Section 632-a, however, sets forth its scope in readily discernible language. Section 632-a may not be the most carefully drafted statute ever passed by the New York State legislature, but the Constitution does not require "meticulous specificity" in order for a statute to survive a void for vagueness challenge. See Grayned v. City of Rockford, 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972). The Fourteenth Amendment requires that due process be afforded in that laws provide fair warning to those within its scope, that clear standards for enforcement of the law exist, and that no law should inhibit the exercise of basic constitutional freedoms. See Id. at 108-09, 92 S.Ct. at 2298-99.
An inspection of the language of section 632-a indicates that plaintiff's argument must fail. First, the statute clearly delineates its application to anyone who contracts with a person "accused or convicted of a crime in this state." Section 632-a(1). "Convicted person" is further defined as "any person convicted of a crime in this state either by entry of a plea of guilty or by conviction after trial and any person who has voluntarily and intelligently admitted the commission of a crime for which such person was not prosecuted." Section 632-a(10)(b). Section 632-a also sets forth when the statute applies. It is applicable to any contract entered into with such convicted person with respect to "the reenactment of such crime by way of a movie, book, magazine article, tape recording, phonograph *180 record, radio or television presentation, live entertainment of any kind, or from the expression of such accused or convicted person's thoughts, feelings, opinions or emotions regarding such crime." Section 632-a(1). Finally, section 632-a delineates how a covered person may comply with its requirements. The statute directs such contracting person to "submit a copy of such contract to the board to pay over to the board any moneys which would otherwise, by the terms of such contract, be owing to the person so accused or convicted or his representatives." Section 632a(1).
Plaintiff cannot argue that it was unaware that Hill fell under the application of section 632-a. Wiseguy was written in order to obtain an "inside look" at organized crime in New York City. Hill was known to be a long-time participant in organized crime and Simon & Schuster actively pursued his "thoughts, feelings, opinions [and] emotions" regarding such crime. See Korda Aff. ¶¶ 3-6; Pileggi Aff. ¶¶ 2-4. Simon & Schuster's argument that section 632-a may apply to other expressive works that are less obvious than Hill's lacks merit. See supra note 5. There is no indication that section 632-a has been applied arbitrarily. The Board's determination that section 632-a did not apply to Bernhard Goetz was consistent with his acquittal on all counts but one  criminal possession of a weapon in the third degree, a class D felony. Penal L. § 265.02(4). In addition, the Board's determinations have been upheld in all but one instance. See In re Robert Halmi, Sr., 128 A.D.2d 411, 512 N.Y.S.2d 650 (1st Dept.1987).
The Court finds that section 632-a meets constitutional muster. The statute provides fair notice to those to whom it applies, it provides guidelines for compliance, and, as the Court's discussion indicates, see supra Part B., the statute does not inhibit the exercise of basic constitutional freedoms.

Conclusion
Based on the above analysis, the Court denies the plaintiff's motion for summary judgment and grants defendant's cross-motion for summary judgment. Section 632-a is constitutional under the First and Fourteenth Amendments. The Complaint is ordered dismissed, and this case is removed from the active docket of this Court.
SO ORDERED.
NOTES
[1] Sterling Lord, however, did submit objections to the Proposed Determination and Order and requested a hearing. Petromelis Aff. ¶¶ 34, 35.
[2] Defendants urge the Court to classify plaintiff's activities, writing and publishing books, as commercial speech which is not automatically protected by the First Amendment. Defendants base their assertion on plaintiff's theory that people will not write books on crime if they are not certain of prompt payment. Defendants argue, then, that writing books concerning crime is motivated solely by financial considerations and therefore is a form of commercial speech. The Court disagrees with defendants' position and has found no authority to this effect. Courts have held consistently that the mere fact that there is an economic motivation in a person's activity does not turn the person's activity into commercial speech. See Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 67, 103 S.Ct. 2875, 2880, 77 L.Ed.2d 469 (1983); Bigelow v. Virginia, 421 U.S. 809, 818, 95 S.Ct. 2222, 2230, 44 L.Ed.2d 600 (1975); Ginzburg v. United States, 383 U.S. 463, 474, 86 S.Ct. 942, 949, 16 L.Ed.2d 31 (1966); Thornhill v. Alabama, 310 U.S. 88, 103, 60 S.Ct. 736, 744, 84 L.Ed. 1093 (1940). It would be absurd for this Court to deny First Amendment protection to the activities of book publishers and to classify books among activities such as advertising which do "no more than propose a commercial transaction." Bolger, 463 U.S. at 66, 103 S.Ct. at 2880 (quoting Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 762, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976)). See also Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 501-02, 72 S.Ct. 777, 780-81, 96 L.Ed. 1098 (1952) (profit motive of media does not make First Amendment inapplicable).
[3] Simon & Schuster asserts that many of the following books would not have been written if section 632-a had been in effect at the time of their writing: Autobiography of Malcolm X, Martin Luther King Jr.,'s Where Do We Go From Here?, Henry David Thoreau's On Civil Disobedience, Eldridge Cleaver's Soul on Ice, Norman Mailer's The Armies of the Night, Jean Genet's A Thief's Journal, Whitaker Chamber's Witness, John Dean's Blind Ambition, and John Erlichman's Witness to Power.
[4] Because section 632-a's application is limited to the proceeds of expressive activity, plaintiff argues that the statute is under-inclusive. Plaintiff would like the statute to affect all of the criminal's assets. The Court is uncertain why plaintiffs present this argument. It seems that a statute that attached all of the assets of a criminal would also have the alleged effect of deterring the writing of books, which plaintiff predicts. This argument is less than helpful.
[5] As is demonstrated by the Board's review of the application of the subway gunman Bernhard Goetz for a determination as to whether section 632-a applies to him, a crime which is determined to be "victimless" is one which avoids the restrictions of the law. See Simon & Schuster Reply Mem., Exh. B. Simon and Schuster's vehement references to what "might not" be published are thus purely conjectural.