OPINION OF THE COURT
Israel Rubin, J.
Petitioner foundation, by way of an order to show cause, seeks a judgment annulling the determination of respondent Crime Victims Board, entered October 26, 1987, which declared that the book Stranger in Two Worlds by Jean Harris is subject to Executive Law § 632-a, the so-called "Son of Sam Law.” The parties have stipulated, inter alia, that the subject order shall be stayed pending final disposition of this matter, that Macmillan, Inc. shall be added as an intervening petitioner, and that Macmillan, Inc. shall segregate all sums owed to Jean Harris pursuant to a publishing agreement dated March 19, 1985 and hold them for disposition in accordance with the judgment herein.
Section 632-a (1) of the Executive Law provides, in pertinent part: "Every person, firm, corporation, association or other legal entity contracting with any person * * * accused or convicted of a crime in this state, with respect to the reenactment of such crime, by way of a movie, book, magazine article, tape recording, phonograph record, radio or television presentation, live entertainment of any kind, or from the expression of such accused person’s thoughts, feelings, opinions or emotions regarding such crime, shall * * * pay over to the board any moneys which would otherwise, by terms of such contract, be owing to the person so * * * convicted or his representatives. The board shall deposit such moneys in an escrow account for the benefit of and payable to any victim * * * of crimes committed by: (i) such convicted person; or (ii) by such accused person but only if such accused person is eventually convicted of the crime and provided that such victim, within five years of the date of the establishment of such escrow account, brings a civil action in a court of competent jurisdiction and recovers a money judgment against such person or his representatives.”
In early 1986, respondent Crime Victims Board, upon learning about the existence of a contract dated March 19, 1985 between intervening petitioner Macmillan, Inc. (Macmillan) and Jean Harris, commenced an investigation to determine if the contract came within the purview of the statute. By letter dated February 10, 1986, the Board requested a copy of the *1001 subject contract from Macmillan. In a reply dated February 11, 1986, Macmillan acknowledged that it was familiar with the statute, but stated that it had not submitted a copy of the contract to the Board because it believed, on the basis of sample material it had received, that the book to be written by Jean Harris would concern "the plight of children with mothers behind bars”, as a magazine article had described it in January 1985. The letter went on to state that, when the "raw” manuscript was received in early September 1985, it was clear that the contents of the book "would differ substantially from what Mrs. Harris had originally submitted and that it was impossible to assess the potential applicability of the statute until the final shaping of the book had been completed.”
In its final determination, dated October 26, 1987, the Board found that the contract, which provides for payment of $50,000 to Harris upon signing and an additional $50,000 upon submission of an appropriate manuscript, is subject to the statute. The Board further determined that a 10% commission paid to Harris’s agent was proper. Therefore, it ordered Jean Harris to pay over to the Board $45,000 (net of commission) already received and, upon her failure to pay such amount within 30 days after issuance of the order, it ordered Macmillan to pay such amount. It further ordered that any other amounts due under the contract be turned over to the Board to be held in escrow pursuant to the statute.
Petitioners contend that section 632-a of the Executive Law violates the First Amendment to the US Constitution and article I, § 8 of the NY Constitution (although petitioners advance no separate State constitutional argument). Petitioners further claim that the law does not apply to the subject work and that, in any event, the order issued by respondent Crime Victims Board is invalid for failure of the Board to comply with procedural due process requirements.
It is well settled that, while a CPLR article 78 proceeding may be used to determine whether a legislative enactment has been applied in a manner consistent with constitutional requirements (Matter of Overhill Bldg. Co. v Delany, 28 NY2d 449, 458 [1971]), it may not be utilized to review the constitutionality of the enactment itself, requiring that this court convert the matter into a declaratory judgment action (CPLR 103; Matter of Kovarsky v Housing & Dev. Admin., 31 NY2d 184, 192 [1972]; see also Matter of Ames Volkswagen v State Tax Commn., 47 NY2d 345, 348 [1979]).
*1002 It is appropriate to first take up petitioners’ argument that due process has not been accorded. They contend that the Board’s actions (1) in failing to identify the particular passages of the Harris book which bring it within the ambit of section 632-a of the Executive Law; and (2) in upholding the findings of one of its members that the work is subject to the statute violate principles of procedural due process.
The procedure employed by the Board in effectuating the statute is set forth in 9 NYCRR 526.1. The rule requires an investigation to be conducted to determine if the contract in question falls within the purview of section 632-a of the Executive Law. Upon completion of the investigation, the results are incorporated into a proposed determination, notice of which is served upon the parties to the contract, the accused or convicted party and his victims. The parties are advised that the proposed determination will become final 30 days after service, unless a written request for a hearing is received from an interested person. Following receipt of such a request, a hearing is conducted by one or more Board members assigned by the chairman to report on the matter and file written findings with the full Board. Following due consideration of the member’s report, the Board issues a final determination containing the findings of fact and conclusions of law which support its decision (9 NYCRR 526.1 [f]).
Due process requires only that the parties be afforded reasonable notice of the proceeding and the opportunity to be heard in objection thereto, and what is reasonable may be considered "with due regard for the practicalities and peculiarities of the case” (Mullane v Central Hanover Trust Co., 339 US 306, 314 [1950]). The same criteria are applicable to administrative proceedings (Matter of Alvarado v State of New York, 110 AD2d 583 [1st Dept 1985]).
The propriety of the procedure followed by the Crime Victims Board is not seriously open to question. A board or officer may designate that a hearing be conducted by a board member or a subordinate as long as the ultimate determination is that of the board or officer empowered to make it (Matter of Simpson v Wolansky, 38 NY2d 391 [1975]). The proposed determination, issued July 28, 1986, contained a detailed statement of the issues involved in this controversy. As such, it must be considered more than adequate notice of the nature of the proceeding (see, Matter of Photo Medic Equip. v Suffolk County Dept. of Health Servs., 122 AD2d 882 [2d Dept 1986]). Therefore, petitioners were adequately apprised of the issues *1003 presented in this administrative proceeding and were heard in opposition to the agency’s contentions.
The assertion that the Board failed to identify the specific passages which subject the book to the statute is of no significance. The Board alleged, generally, that material contained within pages 123 and 192 renders the book subject to the law. However, based upon the observations which follow, this court deems it quite unnecessary that specific passages be identified as statutorily objectionable (see, Matter of Fitzgerald v Libous, 44 NY2d 660 [1978]).
Petitioners’ contention that the subject work does not fall within the purview of the statute is totally uncompelling. The gravamen of petitioners’ argument is that the two chapters, "Harrison, New York: The End of the Line” and "Westchester: The People vs. Jean Harris,” which deal with the death of Herman Tarnower, contain only material available from the trial transcript. They maintain, in their memorandum of law, that only original material should be subject to the statute and that it should be construed "to exclude legitimate reference to evidence in the case as part of a general discussion of the trial.”
It must be emphasized that the statute contains no exclusion for material which is introduced during trial and which is therefore a matter of public record. Any such interpretation would constitute a broad exception to the law, and imposition of such a significant limitation on the scope of the legislative enactment by this court would be an unwarranted exercise of judicial construction.
Petitioners’ attempt to characterize the two chapters dealing with Tarnower’s death as a relatively minor portion of the book misrepresents their significance to the autobiography as a whole. Those chapters make up the core of the work, around which the narrative is structured. Preceding chapters describe the forces and events leading up to the crime; Harris’s introduction to Tarnower ("New York: The Fateful Year”), their relationship ("Brooklyn: Hy”) and the pressures which confronted Harris, causing her to become depressed and contemplate suicide ("Virginia: Headmistress”). Following chapters tell of Harris’s experiences as a consequence of her conviction for Tarnower’s murder; her incarceration in the correctional facility at Bedford Hills and her observations about life in that iústitution and about the people she has encountered there. It is not unfair to say that the entire book is centered *1004 around Tarnower’s death, and at least half the work is comprised of the story of the crime.
Petitioner’s attempt to exempt the book from the operation of the statute on the ground that Jean Harris will derive no economic benefit from its publication is likewise unavailing. The statute expressly applies to assignees of any person convicted of a crime (Executive Law § 632-a [1]). If this provision is not definite enough, the law further provides, "Any action taken by any person accused or convicted of a crime, whether by way of execution of a power of attorney, creation of corporate entities or otherwise, to defeat the purpose of this section shall be null and void as against the public policy of this state” (Executive Law § 632-a [9]). The legislative intent is clearly to afford a source of funds out of which civil judgments obtained by victims of a crime may be satisfied. While the creation of a trust to benefit disadvantaged children whose mothers have been incarcerated at the Bedford Hills Correctional Facility represents a laudable undertaking, the funding of that trust with moneys derived from the sale of a book about a crime is contrary to statutory intent and adverse to the interests of the crime victim. "Victim”, for statutory purposes, includes anyone who suffers a pecuniary loss as a direct result of the crime (Executive Law § 632-a [10] [a]), a definition which encompasses the legal representative of an estate on a claim for wrongful death (see, Executive Law § 632-a [7]).
Having concluded that petitioners where accorded due process and that the contract for the right to publish the book entitled Stranger in Two Worlds falls within the ambit of section 632-a of the Executive Law, it is appropriate to examine petitioners’ First Amendment arguments. Before proceeding further, however, it is enlightening to examine the statute, not in terms of what expressive activities it restricts, but in view of those activities it does not restrict.
Most significantly, the statute does not prohibit a person convicted or accused of a crime from engaging in conduct designed to communicate the details of the crime or his thoughts and feelings about its commission or about the resulting prosecution and trial. Nor does the law prohibit any segment of the press from functioning as the instrument for the communication of such information to the public or from reaping a financial benefit from performance of that function. The statute affects only the rights of the perpetrator to receive any profit from communications concerning the crime *1005 unless and until all proceeds have been held in escrow for five years and made available to satisfy any civil judgment obtained against the wrongdoer. To assist the victim in seeking compensation for any loss, the statute provides that civil actions may be commenced within five years after the escrow account is established, irrespective of the Statute of Limitations normally applicable to the particular cause of action (Executive Law § 632-a [7]; Barrett v Wojtowicz, 66 AD2d 604 [2d Dept 1979]). What the law regulates, therefore, is not speech but disposition of property (viz., royalties) derived from specified expressive activity by a particular type of speaker. The issue is therefore whether First Amendment protection encompasses the unfettered right of a criminal-author to receive immediate payment for communication about the crime and, if so, whether the victim’s right to compensation and the State’s interest in preventing the criminal from profiting from the offense justifies the abridgement of expression which application of the statute entails.
Petitioners have cited no authority for the proposition that the First Amendment protects not only the right to expression but also the right to payment for the exercise of that right. They rely on Arkansas Writers’ Project v Ragland (481 US 221 [1987]), Minneapolis Star v Minnesota Commr. of Revenue (460 US 575 [1983]) and Legi-Tech, Inc. v Keiper (766 F2d 728 [2d Cir 1985]), all of which deal with financial burdens imposed solely upon the press or upon functions in which the press engages. Because the legislation under examination places no burden on the press, which is free to report about the crime from the perspective of the perpetrator without restriction on any profit which might be derived, these cases are entirely inapposite.
The statute provides a means to attach funds due to a tortfeasor in order to satisfy potential judgments which may be obtained by injured parties. Under the theory advanced by petitioners, it would be constitutionally suspect to garnishee the salary of a writer for failure to make child support payments because the income is derived from protected expressive activity. In the matter before this court, the mere fact that the subject of the writing embraced by the statute is the incident out of which the suit for damages arises does not elevate the expressive activity to a special protected status. Nor does it render the attachment and escrow of funds payable to the author a differential burden imposed upon protected expressive activity. Therefore, those cases cited by *1006 petitioners dealing with regulation of the discussion of particular topics and the expression of particular points of view (e.g., First Natl. Bank v Belotti, 435 US 765 [1978]; Federal Communications Commn. v League of Women Voters, 468 US 364 [1984]; Consolidated Edison Co. v Public Serv. Commn., 447 US 530, 537 [1980]) have no bearing on the issue before the court.
It is apparent that petitioner Macmillan is concerned about the potential inhibiting effect of the statute on the willingness of criminal-authors to write about their crimes, thus eliminating a source of profit for the publisher as well as the author. This concern is clearly without foundation in the instant proceeding as the author has no interest in receiving the profit from the book, having assigned the proceeds to a foundation (albeit one having Mrs. Harris’s son David, who is also a director, as its president and another son, James, as a second director). Moreover, petitioners have asserted that the facts surrounding Tarnower’s death are available in the trial transcript, which means that a book about the crime could have been written from information available as a matter of public record, supplemented by material obtained from interviews with persons acquaintanced with Mrs. Harris. Indeed, her affidavit states that "other people have used the transcript of the trial to derive profit from reenacting my life without my knowledge, permission or benefit.” It does not follow that the statute will necessarily prevent either the dissemination of information of interest to the public or the generation of income earned from publication of materials concerning the crime.
Even if it is assumed, arguendo, that the statute will have some inhibiting effect on the free exchange of information, any such impact results not from curtailment of the expression of a particular idea or viewpoint (e.g., New York Times v Sullivan, 376 US 254, 276 [1964]) but from compliance with a scheme for attachment which may have the effect of discouraging the flow of information (e.g., Buckley v Valeo, 424 US 1, 19-22 [1976]; see also, Tribe, American Constitutional Law § 12-2, at 789-790 [2d ed]). Thus, a First Amendment analysis requires a balancing of the governmental interest sought to be advanced against any encroachment of First Amendment guarantees which may indirectly result. If the free exchange of ideas is not unduly restricted, the enactment will pass constitutional muster (Cox v New Hampshire, 312 US 569, 574 [1941]). The State’s interests in providing a source of funds to *1007 compensate victims of a crime who might otherwise have no source of redress and in barring a given perpetrator from reaping a potential windfall from the publicity generated by a particularly controversial or infamous crime significantly outweigh the minimal impact on the dissemination of information (United States v O’Brien, 391 US 367, 377 [1968]).
While the Constitution has provided protection to the rights of the accused for two centuries, legislation designed to further the rights of crime victims is a relatively recent and commendable innovation. The platitude that, by virtue of a period of incarceration, a criminal has "paid his debt to society” may be small comfort to a family devastated by the death or disability of its breadwinner at the hands of an attacker. Petitioners’ objection that the statute concentrates only on income derived from communication about the crime has some merit insofar as it indicates that the law may not go far enough in subjecting future income of the perpetrator to the claims of the victim although, as a practical matter, most criminals will possess no other source of income. However, as the concept of victims’ rights develops, both legislation and case law will contribute to its refinement. For the moment, it need only be observed that the subordination of the criminal’s right to receive compensation for literary efforts regarding the crime to the victim’s right to receive compensation for damages sustained as a result of its commission is neither repugnant to constitutional standards nor to the court’s concepts of equity and fairness. Therefore, this court concludes that, to the extent it might be said to inhibit First Amendment activity, the statute places no burden thereon which is not narrowly tailored to a compelling State interest (First Natl. Bank v Belotti, supra, 435 US 765, 786 [1978]).
Petitioners’ last constitutional objection is based upon the statute’s asserted vagueness and overbreadth. It is clear that a statute which is "so vague, indefinite and uncertain” that its meaning cannot be discerned offends the due process guarantee under the Fourteenth Amendment (Lanzetta v New Jersey, 306 US 451, 458 [1939]). However, as the preceding analysis reveals, this court cannot agree with petitioners’ assertion that the law is drafted with such imprecision that a person of normal intelligence is not apprised as to what it prohibits so that he may comport himself accordingly (Grayned v City of Rockford, 408 US 104, 108 [1972]), or that respondent does not have reasonably clear guidelines so as to preclude discriminatory or capricious enforcement (Smith v Goguen, 415 US 566, *1008 573 [1974]). The statutory purpose is clear (compensation of the victim), it is triggered by a well-defined event (commission of a crime) and it applies to a limited class of individuals (criminal-authors). That instances may be envisioned where a work should not be made subject to the provisions of the statute, such as where the crime is a minor offense or was committed by a youthful offender or in the remote past, does not render it constitutionally vague (e.g., Cox v Louisiana, 379 US 559 [1965], prohibition against picketing "near” a courthouse held to be both precise and narrowly drafted). Petitioners may be assured "that the New York courts will apply the statute consistently with the constitutional command” (Time, Inc. v Hill, 385 US 374, 397 [1967]) and so avoid unwarranted infringement of First Amendment prerogatives.
Similarly, the mere possibility that a statute might be applied to some protected expressive activity does not compel the court to declare the statute void (New York v Ferber, 458 US 747, 768 [1982]). Development of the law is best served by the adjudication of the dispute actually before the court, thus precluding speculation concerning the statute’s effect on protected expression in some hypothetical context (Younger v Harris, 401 US 37, 52 [1971]; Brockett v Spokane Arcades, 472 US 491, 501-502 [1985]). Upon this review of the law, this court will not "assume that the New York courts will widen the possibly invalid reach of the statute” (New York v Ferber, supra, at 773) and thus obviate the opportunity for our courts to construe section 632-a of the Executive Law in a manner consistent with First Amendment protections.
The proceeding at bar does not demonstrate that any inhibition of protected expression has occurred. The statute does not bar publication of any manuscript which a publisher might receive or prevent a criminal-author from telling about the crime. Furthermore, a publisher may shield itself from any potential liability by the simple expedient of holding any funds due to the author in escrow and making payment subject to any determination of respondent Crime Victims Board.
Petitioner Macmillan nevertheless argues that, at the time its contract with Mrs. Harris was signed, it was under the impression that the book would be about prison reform. While it is alleged that this impression was conveyed by a 100-page outline it had received from the author, a copy of this material has not been submitted upon this application. The provisional title of the work stated in the contract, signed on *1009 March 19, 1985, is "Jean Harris: Autobiographical Reflections.” It is apparent to everyone, except Macmillan, that any autobiography of Jean Harris would make prominent mention of the Tarnower matter. An autobiography of Jean Harris which fails to mention the most profound event in her life is no more tenable than an autobiography of Ronald Reagan which omits any mention of his presidency. However, even taking Macmillan’s assertions at face value, a publisher is not without editorial control over a manuscript. Had Macmillan been willing to forego the publicity attendant upon publication of Mrs. Harris’s own version of the death of Herman Tarnower, it could have deleted all reference to the event from the final version of the book. However, from the press releases of early 1986, it is clear that Macmillan used the publicity value of the murder to the fullest, heralding the forthcoming book as "the crime of the century — by a woman convicted of committing it.” It could only be naiveté on Macmillan’s part which would have caused it to overlook, from the inception, the intense public interest in Jean Harris, an interest which arose solely from her involvement in Herman Tarnower’s untimely demise. Macmillan’s intimation that, at the time the agreement with Mrs. Harris was signed, it never occurred to it that the book would include references to the crime, is simply not credible. But even if that is, in fact, what transpired, the statute is not rendered constitutionally infirm merely because an entity subject to its provisions fails to anticipate its application.
Accordingly, the petition is denied. This court declares that section 632-a of the Executive Law is applicable to the contract between Macmillan and Harris, that the determination of respondent Crime Victims Board is not arbitrary and capricious, and that the statute does not violate the First and Fourteenth Amendments of the US Constitution and article I, § 8 of the NY Constitution.