916 F.2d 777
 59 USLW 2234, 18 Media L. Rep. 1187
 SIMON & SCHUSTER, INC., Plaintiff-Appellant,
v.
Gennaro FISCHETTI, George L. Grobe, Jr., Diane McGrath, and
Angelo Petromelis, Individually and in Their
Capacities as Members of the New York
State Crime Victims Board,
Defendants-Appellees.
 No. 1044, Docket 89-9192.
 United States Court of Appeals,
Second Circuit.
 Argued March 22, 1990.
Decided Oct. 3, 1990.
 
 Ronald S. Rauchberg (Charles S. Sims, Proskauer Rose Goetz & Mendelsohn, Mark Morril, Eric Rayman, Simon & Schuster, Inc., New York City, of counsel), for plaintiff-appellant.
 Howard L. Zwickel, Asst. Atty. Gen. (Robert Abrams, Atty. Gen. of State of N.Y., Susan L. Watson, Asst. Atty. Gen., New York City, of counsel), for defendants-appellees.
 Leon Friedman and Arthur Eisenberg, New York City, filed a brief for amici curiae, PEN American Center and the New York Civil Liberties Union.
 R. Bruce Rich (Robin E. Silverman, Weil Gotshal & Manges, New York City, of counsel), filed a brief for amicus curiae, Ass'n of American Publishers, Inc.
 Before NEWMAN, MINER and WALKER, Circuit Judges.
 MINER, Circuit Judge:
 
 
 1
 Plaintiff-appellant Simon & Schuster, Inc. ("Simon & Schuster") appeals from a judgment entered in the United States District Court for the Southern District of New York (Keenan, J.) upon an order granting the motion of defendants-appellees, Members of the New York State Crime Victims Board ("Victims Board"), for summary judgment pursuant to Fed.R.Civ.P. 56 and denying its own motion for the same relief. Simon & Schuster, a leading book publisher, brought this action to challenge the constitutionality of section 632-a of the New York Executive Law. N.Y. Exec. Law Sec. 632-a (McKinney 1982 & Supp.1990). Section 632-a requires that the profits derived by a criminal from the exploitation of his or her crime be deposited as earned in an escrow account maintained by the Victims Board as a means of preserving funds for the satisfaction of civil judgments later recovered by the victims of the exploited crimes. The challenge to the statute is grounded in the first and fourteenth amendments. Simon & Schuster asserts that the statute imposes a direct restriction on speech, is therefore subject to strict scrutiny, and cannot survive the scrutiny. The Victims Board contends that the provision in question does not burden freedom of speech in any way, imposes only an incidental burden if it does and, in any event, furthers a compelling state interest in a manner narrowly tailored to do so.
 
 
 2
 In granting summary judgment to the Victims Board and denying that relief to Simon & Schuster, the district court determined that "[t]he state's interest in compensating crime victims is unrelated to the suppression of free expression and any burden on free expression is merely incidental." Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd., 724 F.Supp. 170, 177 (S.D.N.Y.1989). Finding the incidental burden justified by the important interest of the state in compensating the victims of crime, the district court concluded that section 632-a "is not unconstitutional on its face nor as applied to plaintiff." Id. at 179.
 
 
 3
 We agree with Simon & Schuster that the statute in question imposes a direct, rather than an incidental, burden on speech and that it therefore must meet the requirements of the strict scrutiny test to survive the constitutional challenge. We conclude, however, that the statute meets the test and accordingly affirm the judgment, although on grounds different from those relied on by the district court.
 
 BACKGROUND
 
 4
 Originally enacted in 1977 and amended three times thereafter, section 632-a of the New York Executive Law provides that each
 
 
 5
 legal entity contracting with any person or the representative or assignee of any person, accused or convicted of a crime in this state, with respect to the reenactment of such crime, by way of a movie, book, magazine article, tape recording, phonograph record, radio or television presentation, live entertainment of any kind, or from the expression of such accused or convicted person's thoughts, feelings, opinions or emotions regarding such crime, shall submit a copy of such contract to the [Crime Victims B]oard and pay over to the [B]oard any moneys which would otherwise, by terms of such contract, be owing to the person so accused or convicted or his representatives.
 
 
 6
 N.Y.Exec.Law Sec. 632-a(1); see 1977 N.Y. Laws 823; 1978 N.Y. Laws 417; 1986 N.Y. Laws 74.
 
 
 7
 The statute directs that the Victims Board deposit the monies so received "in an escrow account for the benefit of and payable to any victim or the legal representative of any victim of crimes committed by: (i) such convicted person; or (ii) by such accused person, but only if such accused person is eventually convicted of the crime." N.Y.Exec.Law Sec. 632-a(1). To gain access to the funds, the victim must recover a money judgment in a civil action brought against the criminal within five years of the establishment of the escrow account. Id. Civil judgments obtained by crime victims rank third in the order of priority of claims that may be paid out of the escrow account. Id. Sec. 632-a(11)(c) (McKinney Supp.1990). According to the statute, the order of priority, from first to fifth, is as follows: attorney's fees granted by a court of competent jurisdiction for representation of the accused at any stage of the criminal proceedings and expenses allowed by the Victims Board for the production of monies paid into the escrow account, the total of such fees and expenses not to exceed one-fifth of the account; subrogation claims of the state for payments made to a victim, not to exceed one-half of the civil judgment obtained by a victim; victims' civil judgments; judgments of other creditors and claims of persons presenting lawful demands through the person accused or convicted of the crime, including the demands of tax authorities; and the claims of the person accused or convicted of the crime. Id. Sec. 632-a(11)(a)-(e).
 
 
 8
 This action tests the requirements imposed by the statute upon book publishers generally and Simon & Schuster in particular. It had its genesis in a decision made at the highest levels of the Simon & Schuster organization to commission a book dealing with the life and activities of a career criminal named Henry Hill. At the time that Hill came to the attention of the publisher, he was cooperating with state and federal prosecutors under the Federal Witness Protection Program. The idea of the book was to demonstrate the pedestrian activities of a low-level member of a criminal enterprise and to dispel commonly-held romantic notions about life in a crime "family." For the project, Simon & Schuster sought out Sterling Lord, a prominent literary agent, for assistance in finding an author willing to write the book in cooperation with Hill. Lord found Nicholas Pileggi, an experienced crime writer, and ultimately negotiated a book contract subscribed by Hill, Pileggi and Simon & Schuster on September 1, 1981. An earlier agreement, dated August 21, 1981, to which Hill, Pileggi and Lord were parties, provided for the division of payments to be received from the publisher. There seems to be no question that Hill would not have agreed to participate in the project without the assurance he would be paid.
 
 
 9
 Pileggi spent more than three hundred hours with Hill, who provided the author with extensive information about his life in crime. The result of their collaboration was a popular and widely-acclaimed book, originally published by Simon & Schuster in January of 1986, bearing the title Wiseguy. The book describes in detail the crimes in which Hill participated during his career as a "wiseguy" or hoodlum: bribery, assault, extortion, theft, burglary, arson, drug dealing, credit card fraud and murder. Among the more celebrated crimes in which he was involved were the theft of nearly six million dollars in cash and jewelry from the Lufthansa terminal at Kennedy airport and the bribery of Boston College basketball players. Although he served brief prison terms, Hill was prosecuted for only a few of the crimes admitted to in the book. Needless to say, there were many, many victims of the crimes committed by Henry Hill, and a great number of those victims are identified in Wiseguy. According to Simon & Schuster, more than 90,000 copies of the book in its trade edition have been sold, and more than one million copies of a soft cover edition, published in February of 1987, are in print.
 
 
 10
 On January 31, 1986, counsel for the Victims Board wrote to Simon & Schuster: "It has come to our attention that you may have contracted with a person accused or convicted of a crime for the payment of monies to such person." Citing section 632-a of the Executive Law, the counsel called upon the publisher to provide the Victims Board with copies of "all such contracts," the dollar amounts and dates of payments to Henry Hill, and certain other information stemming from the publication of Wiseguy. By letter dated May 22, 1986, Simon & Schuster provided to the Victims Board the dates and amounts of payments made by the publisher "to the Sterling Lord Agency for the account of Mr. Hill." The total of the amounts shown was $96,250. Enclosed with the letter were copies of the August 21, 1981 and September 1, 1981 agreements, as well as copies of two agreements extending the manuscript delivery date. Simon & Schuster has suspended further payments to Hill, as requested by the Victims Board.
 
 
 11
 On June 15, 1987, the Victims Board served upon Simon & Schuster a Notice and a Proposed Determination and Order. Among the proposed findings were the following: the September 1, 1981 Contract "is of the type regulated by Executive Law Sec. 632-a" and "a copy of such Contract should have been turned over to the Crime Victims Board in 1981 at the time of execution"; the book Wiseguy "contains thoughts, feelings, opinions and emotions regarding crimes committed by Henry Hill as well as his admission to involvement in such crimes"; all payments to "Hill or his representatives under the Contract must be turned over to the Crime Victims Board to be held in escrow for victims of crimes committed by Henry Hill"; no payments due Nicholas Pileggi, who is a co-author and not a representative of Hill, are "subject to the mandate of Executive Law Sec. 632-a"; and Sterling Lord is entitled to "make application to the Board for payment of necessary expenses for the production of monies paid into the escrow account to be established by the Board."
 
 
 12
 In accordance with the proposed findings, the Victims Board proposed to order that Hill pay over to the Board all monies theretofore received, plus interest, less commissions paid to Sterling Lord; that in the event Hill failed to do so, Simon & Schuster "shall turn over to the Board the total of monies it wrongfully distributed to Henry Hill"; that Simon & Schuster transfer to the Board all payments due Hill, "including the $27,958 presently held, as well as any and all future royalties or other monies that would otherwise be payable to Henry Hill or his representatives under the Contract"; and that Sterling Lord pay to the Board any monies received as Hill's representative from Simon & Schuster "as well as any other past or future monies received or to be received from the Contract on account of Henry Hill." No fact-finding having been requested by Simon & Schuster or any other person, the Proposed Determination and Order became the Final Determination and Order of the Victims Board on July 15, 1987 in conformity with the Notice served by the Board.
 
 
 13
 The action giving rise to the appeal before us, brought under 42 U.S.C. Sec. 1983 (1982) to enforce rights guaranteed by the United States Constitution, was commenced on August 3, 1987 as a consequence of the Victim Board's order. Sought in the prayer for relief in Simon & Schuster's complaint were: an order declaring section 632-a violative of the first and fourteenth amendments "on its face and as applied"; an injunction prohibiting the Victims Board "from taking any steps to apply or enforce" the statute; and an order awarding attorneys' fees pursuant to 42 U.S.C. Sec. 1988. Some time after the filing of an Answer by the Victims Board, cross-motions for summary judgment were filed. On September 19, 1988 the motions came on for argument before Judge Keenan, who granted the motion of the Victims Board and denied the motion of Simon & Schuster in a comprehensive Opinion and Order filed on October 26, 1989.
 
 
 14
 Addressing the first amendment challenge, Judge Keenan wrote:
 
 
 15
 Applying [United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (statute criminalizing destruction of draft card is not directed at expressive activity and imposes incidental restriction on First Amendment freedom no greater than is essential) ] to section 632-a, the Court finds first that the New York state legislature acted within its authority in enacting the statute. Both parties agree that victim compensation is necessary and that the most effective means of compensating crime victims should be developed. Related to this authority, then, is the important governmental interest of victim compensation. The Court has determined that this interest is unrelated to the freedom of expression. As has been discussed, the interest in compensating victims does not involve suppressing speech, but merely attaching the proceeds of that speech for the benefit of the victim.
 
 
 16
 Finally, the Court finds that any incidental restriction on the First Amendment freedom imposed by section 632-a is no greater than is essential for the government's interest in compensating crime victims. The law is drawn not to prohibit expressive activity, but to garnish the proceeds so that they will be used in a productive manner. The statute reaches only proceeds from expressive activity for the purpose of preventing a criminal from directly profiting from his or her crime.
 
 
 17
 724 F.Supp. at 178-79.
 
 
 18
 The district court also rejected Simon & Schuster's fourteenth amendment claim that the statute is overbroad and vague. That claim is not advanced on appeal.
 
 DISCUSSION
 
 19
 We think that the District Court erred in testing section 632-a under the standards established in United States v. O'Brien. The statute addressed in O'Brien prohibited the destruction of draft cards and therefore was not directed at speech, although it imposed an incidental burden on expression. The Supreme Court held that "a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." O'Brien, 391 U.S. at 376, 88 S.Ct. at 1678-79. To pass constitutional muster, a statute implicating such limitations must 1) be enacted within the constitutional power of the government, 2) further a substantial interest of government not related to suppression of free speech and 3) not impose incidental limitations greater than are essential to the governmental interest. Id. at 377, 88 S.Ct. at 1679. It is this test that the district court applied to section 632-a, despite the Supreme Court's requirement "that the governmental interest in question be unconnected to expression in order to come under O'Brien's less demanding rule." Texas v. Johnson, --- U.S. ----, 109 S.Ct. 2533, 2541, 105 L.Ed.2d 342 (1989).
 
 
 20
 It cannot be said that the governmental interest advanced by section 632-a bears no relation to expression, since the statute burdens directly the speech of those who wish to tell (and sell) the stories of their crimes. The possibility of a payday five years or more down the road, depending on claims against the escrow fund, can hardly be seen as providing an adequate financial incentive. Without a financial incentive to relate their criminal activities, most would-be storytellers will decline to speak or write. It is now settled that the denial of payment for expressive activity constitutes a direct burden on that activity. Meyer v. Grant, 486 U.S. 414, 422-24, 108 S.Ct. 1886, 1892-93, 100 L.Ed.2d 425 (1988). The statute examined in Meyer allowed proposals to amend the Colorado constitution to be placed on the ballot at a general election if a sufficient number of people signed an initiative petition. The same statute made it a felony to pay petition circulators. The Supreme Court, after concluding that the Meyer case involved a restriction subject to "exacting scrutiny," id. at 420, 108 S.Ct. at 1891, held that "[t]he Colorado statute prohibiting the payment of petition circulators imposes a burden on political expression that the State has failed to justify." Id. at 428, 108 S.Ct. at 1895.
 
 
 21
 The district court distinguished the statute examined in Meyer from section 632-a on the ground that the former "abridged the right to engage in political speech which is at the 'core' of the First Amendment," while the latter "has no abridging effect on political speech" and "merely functions to prevent criminals from capitalizing on their crimes." 724 F.Supp. at 177. A distinction based upon political advocacy does not seem to us to be a valid one. According to Meyer, the notion that the solicitation of petition signatures involves protected speech follows from Schaumberg v. Citizens for a Better Environment, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980), a case involving regulation of the financial aspects of charitable solicitation and not core political speech. 486 U.S. at 422, n. 5, 108 S.Ct. at 1892, n. 5; see also Riley v. National Fed'n of the Blind, 487 U.S. 781, 787-88, 108 S.Ct. 2667, 2672-73, 101 L.Ed.2d 669 (1988); Secretary of State of Maryland v. Joseph H. Munson Co., 467 U.S. 947, 959-60, 104 S.Ct. 2839, 2848, 81 L.Ed.2d 786 (1984). Protected expression comes in many forms other than ideological or political speech. Indeed, the first amendment guarantee has been held to extend to the performance of musical and dramatic work. See Schad v. Borough of Mount Ephraim, 452 U.S. 61, 65, 101 S.Ct. 2176, 2180, 68 L.Ed.2d 671 (1981).
 
 
 22
 As has been demonstrated, the statute under attack here has the effect of excluding from circulation the expression of criminals who would write about their crimes if the price were right. However, "[f]or the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). Section 632-a also serves to single out the media for differential treatment based on expressive content, since no assets other than those derived from the recounting of the criminal's story are subject to attachment in the manner provided by the statute. See Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221, 227-31, 107 S.Ct. 1722, 1726-29, 95 L.Ed.2d 209 (1987). Such differential treatment also must survive the strict scrutiny test: a state interest that is compelling and legislation narrowly constructed to accomplish its purpose. Id. at 231, 107 S.Ct. at 1728.
 
 
 23
 It cannot be gainsaid that the state has a very strong interest in preventing criminals from profiting from their crimes. See Riggs v. Palmer, 115 N.Y. 506, 511-12, 22 N.E. 188, 190 (1889); cf. Caplin & Drysdale, Chartered v. United States, --- U.S. ----, 109 S.Ct. 2646, 2654, 105 L.Ed.2d 528 (1989) (governmental interest in depriving criminal of economic power derived from crime). But the state has a much stronger, indeed a compelling, interest in assuring that a criminal not profit from the exploitation of his or her crime while the victims of that crime are in need of compensation by reason of their victimization. The statute in question cannot provide assurance that all criminals will not profit from the exploitation of their wrong-doing. Even under the statute, criminals may receive payments deposited in the escrow fund by publishers if no victims come forward with claims or if funds remain after all claims are paid. A great societal interest is served, however, in barring criminals from profiting at the expense of victims who are in need of compensation and press their demands for restitution. Our society rightly deems it fundamentally unfair for a criminal to be paid for recounting the story of his or her crime while the victim remains uncompensated for financial loss occasioned by the crime.
 
 
 24
 The compelling state interest that spawned the enactment of section 632-a by the New York legislature is revealed in the legislative history:
 
 
 25
 Currently a person may commit a crime causing much damage and personal injury, and then gain substantial financial benefits related to resulting publicity. This bill will ensure that monies received by the criminal under such circumstances shall first be made available to recompense the victims of that crime for their loss and suffering. The requirement of a civil action will prevent the abuse of this privilege.
 
 
 26
 See Assembly Bill Memorandum Re: A 9019, July 15, 1977, reprinted in Legislative Bill Jacket, 1977 N.Y. Laws 823. The Division of Criminal Justice Services also recognized the compelling state interest in a letter of support for the legislation addressed to the Governor's counsel:
 
 
 27
 Though hardly a new phenomenon, there has been a recent realization by the general public that where a defendant is a well-known personality or the crime with which he is charged is one that has aroused a high degree of public interest, he is in a position to make a considerable amount of money from articles, books or television accounts of his life, times and crimes....
 
 
 28
 [T]his bill takes cognizance of the situation and seeks to redirect the money flow from the criminal to his victims. As an expression of the concept of simple justice it cannot be faulted. It is merely another facet of the oft-repeated maxim that crime does not (or should not) pay.
 
 
 29
 See Memorandum from Robert Schlanger, Division of Criminal Justice Services, to Judah Gribetz (August 3, 1977), reprinted in Legislative Bill Jacket, 1977 N.Y. Laws 823.
 
 
 30
 The purpose of the statute, of course, is not to suppress speech but to assure that funds are set aside out of profits derived by criminals from the exploitation of their crimes and made available for the payment of judgments later recovered by the victims of the crimes exploited. In this way, the compelling state interest described above is served. A statute of this type has other purposes as well. It "not only prevents a criminal's unjust enrichment, but also it: (1) decreases the likelihood that society will have to support victims of crime through social programs; (2) satisfies victims' sense of justice and desire for retribution; and (3) increases the criminal's awareness of the consequences of his crime." Okuda, Criminal Antiprofit Laws: Some Thoughts in Favor of Their Constitutionality, 76 Calif.L.Rev. 1353, 1367 (1988) (footnotes omitted).
 
 
 31
 It seems to us that section 632-a is narrowly tailored to the State's interest in denying criminals any gain from the stories of their crimes until the victims of those crimes are fully compensated for all losses arising out of their victimization. The statute recognizes that the only way a criminal can profit directly from a specific crime involving a particular victim, other than by obtaining any proceeds of the crime itself, is by writing or talking about or reenacting it. The statute also recognizes that, as a practical matter, the sole asset of most criminals is the right to tell the story of their crimes. The first amendment right to speak is restricted only as a consequence of their inability to profit until the victim is compensated. Section 632-a is designed to tie up the proceeds until victims have had an opportunity to make their claims for compensation. It provides a specialized form of attachment and is designed to freeze the proceeds of storytelling by criminals for the benefit of those whose misfortunes gave rise to the story.
 
 
 32
 As to Simon & Schuster's argument that New York Civil Practice Law & Rules article 62 (McKinney 1980 & Supp.1990), the general statutory provision for attachment in New York, is sufficient to assure satisfaction of potential judgments by victims, it suffices to say that the provisions of article 62 simply are too limited to fulfill the State's interest in seeing that victims are the first to be compensated from the proceeds of crime story exploitation. While article 62, like section 632-a, serves a security purpose by requiring that property be held for satisfaction of possible future judgments, it is restricted to situations where the defendant: is a nondomiciliary residing outside New York or a foreign corporation not qualified to do business in New York; is a resident or domiciliary who cannot be served despite diligent efforts to do so; has disposed of, removed or secreted property or is about to do so, with intent to defraud creditors or frustrate a possible judgment; or is defending an action based on a judgment entitled to full faith and credit. N.Y.Civ.Prac.L. & R. 6201. Recovery by many crime victims would be rendered impossible if attachment were limited to one of these categories.
 
 
 33
 Simon & Schuster also contends that section 632-a is not well tailored because it is both underinclusive and overinclusive. It is said to be underinclusive as applied in this case because it is addressed to only one kind of book and the royalties derived therefrom. In this connection, Simon & Schuster notes that the statute fails to reach such income as might be earned by a thief hired as a consultant for his or her expertise or received as royalties from other kinds of books. The answer to the underinclusiveness argument is that if the compelling state interest is to compensate victims of crimes out of the proceeds of the sale of stories of their victimization before anyone else benefits, the statute narrowly is drawn to do just that. The general expertise derived by a thief from a series of thefts is not the same as the tale of a specific theft committed against an identifiable victim. Payment for expertise, royalties from books that do not describe crime victims, and other income and assets of criminals may be reached in other ways. Section 632-a deals with readily identifiable, locatable funds that are most commonly available to those who victimize others.
 
 
 34
 The overinclusiveness of the statute is said to lie in its application to books in which particular crimes constitute only a small part of the subject matter, in its application to the entire proceeds due the criminal author from each book covered, and in reaching payments that constitute compensation for the labors of authorship rather than the property of the victim or the fruits of unjust enrichment. These claims of overinclusiveness must be rejected. Section 632-a does not eliminate a criminal's right to speak about a crime, nor does it prevent all payment for the story of the crime. It merely serves to tie up the proceeds of the story until the victim is able to get the first crack at the fund. This is no more than is required by the compelling state interest we have identified. That interest requires that the entire proceeds due the criminal be available to the victim, whether or not the victim's story is a small or large part of the book. The income is derived from the notoriety of the criminal rather than from his or her labors. When that notoriety comes at the expense of a victim in need of compensation and restitution, the income so derived should be available to the victim.
 
 CONCLUSION
 
 35
 We conclude that section 632-a meets the strict scrutiny test of constitutionality and affirm the judgment of the district court.
 
 JON O. NEWMAN, Circuit Judge, dissenting:
 
 36
 There are times when well-intentioned legislators, acting for the best of reasons, enact a statute that violates the Constitution. When that occurs, courts are challenged to resist the passions of the moment that swayed the legislators and to apply the paramount restrictions of the Constitution. This case presents such a challenge.
 
 
 37
 The New York legislature, responding to the public outrage over the 1977 "Son of Sam" murders and to the prospect that the killer, when apprehended, might write a book about his crimes, enacted a statute intended to prevent criminals from profiting from their crimes. See N.Y.Exec.Law Sec. 632-a (McKinney 1982 & Supp.1990). That laudable purpose, which New York is free to carry out in a variety of ways, including comprehensive victim restitution provisions, resulted in a statute that violates the First Amendment. Because the Court upholds the statute, thereby impairing First Amendment protections and depriving the public of valuable writings about activities of high public interest, I respectfully dissent.
 
 
 38
 All members of the panel are in agreement that section 632-a imposes such a direct burden on free expression that its constitutionality is to be tested under standards of "strict scrutiny." See Meyer v. Grant, 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988). We also agree that among the components of the strict scrutiny standard in the area of free expression are requirements that the challenged statute is narrowly tailored to advance important governmental interests and that any distinction made by the statute concerning speech in general or speech of particular content must be "necessary to serve a compelling state interest" and "narrowly drawn to achieve that end." See Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221, 231, 107 S.Ct. 1722, 1728, 95 L.Ed.2d 209 (1987). We disagree on whether section 632-a meets these exacting tests.
 
 
 39
 The application of the statute only to speech, and, more significantly, only to speech of specified content, is beyond dispute. The statute does not require that all payments to criminals be escrowed for the benefit of crime victims; it applies only to payments made to those who write books or use other forms of communication. And, rather than apply to all payments to criminals who write books, it applies only to those payments made to criminals who write books in which they express "thoughts, feelings, opinions, or emotions" regarding their crimes. N.Y.Exec.Law Sec. 632-a(1). The opportunity to sell books on a variety of other topics, enhanced for many criminals by the fame resulting from their crimes, is not disturbed by this statute. Thus, John Ehrlichman can write novels with no concern that his royalties, doubtless augmented by the fame attending his Watergate crimes, will be held for five years to pay claims of victims or other creditors. The content-based application of the statute is vividly illustrated by the decision of the New York Crime Victims Compensation Board, which administers the statute, to apply it to Jean Harris's autobiography, Stranger in Two Worlds, because two chapters, containing primarily testimony from her trial, referred to her crime. See Children of Bedford, Inc. v. Petromelis, 143 Misc.2d 999, 541 N.Y.S.2d 894 (Sup.Ct.N.Y.Cty.1989), aff'd, App.Div., 556 N.Y.S.2d 483 (1st Dep't 1990). Had the book concerned exclusively conditions at Bedford Hills prison, Harris's royalties, though enhanced by the notoriety of her crime, would not have been escrowed for the family of her victim.
 
 
 40
 The Court responds to the content-based discrimination of section 632-a in two ways, neither of which, in my view, is valid. First, the Court applies a legal analysis that defines the state interest being advanced in terms of the statute's scope, thereby reaching the circular result that the scope of the statute is precisely tailored to the state's objective. But the question in all such cases is whether a state, consistent with the First Amendment, can pursue its objective by focusing on speech of particular content. New York is entitled to escrow for the benefit of crime victims all payments to criminals. The question is whether it can escrow only payments to criminals who write books and, even if that is so, whether it can escrow only payments to criminals who write books about their crimes. To say that New York can do so because escrowing this narrow category of payments benefits crime victims, an objective New York is anxious to achieve, eliminates the entire inquiry concerning the validity of content-based discriminations. Every content-based discrimination could be upheld by simply observing that the state is anxious to regulate the designated category of speech. It could have been said as easily in Arkansas Writers that the tax was valid because it achieved the state's objective of raising revenue from the category of publications within the statute's coverage. The Supreme Court, however, was not so easily satisfied, and the Arkansas tax statute that discriminated among types of publications was held to violate the First Amendment.
 
 
 41
 Next, the Court upholds the content-based discrimination on the factual ground that "as a practical matter, the sole asset of most criminals is the right to tell the story of their crimes." 916 F.2d at 783. In the first place, I doubt that this assertion is true, and I am confident that it has not been established either in the record of this case or, if it is a legislative fact, in the proceedings of the New York legislature, which held no hearings on the "Son of Sam" law. Of all criminals who might be liable for restitution, many have assets independent of the proceeds of their crimes. Crime is not exclusively an activity of the poor. And many poor criminals whose crimes involve the taking of property have at least some of that property available for restitution when they are arrested. Thus, I think it unlikely that the opportunity to write about their crimes is the sole or even principal asset of most criminals. My guess is that very few criminals have a crime story worth selling and that their number is far less than the sum of criminals with assets independent of their crime proceeds plus impoverished criminals in possession of such proceeds when arrested.
 
 
 42
 Second, and more fundamentally, even if it were true that the sole asset of most criminals is the right to tell the story of their crime, that observation would not validate New York's content-based regulation of speech. A state cannot select speech of a particular content for regulation just because such speech is a major part of an area of relevant activity that the state has elected not to regulate in full. The tax on a particular category of publications invalidated in Arkansas Writers would not have been saved from invalidation under the First Amendment even if the taxable revenues of the covered publications had accounted for most of the taxable revenues of all publications.
 
 
 43
 Recognizing that a content-based discrimination cannot be upheld if a legitimate state objective can be achieved by reasonably available alternative means, the Court rejects the possibility of using New York's attachment laws to secure for crime victims all profits realized by criminals, including book profits. This rejection rests on the view that New York's attachment remedies are currently too limited to be used by many crime victims. If that is so, the answer required by the First Amendment is to broaden the remedies, not to select books about crime for special regulation.
 
 
 44
 To whatever extent the majority relies on a state interest in assuaging the discomfort of victims distressed that a criminal is profiting from his crime, that interest is unavailing for several reasons. First, alleviating public outrage is not an interest that the First Amendment permits government to advance by regulating books and other forms of expression. See Texas v. Johnson, --- U.S. ----, 109 S.Ct. 2533, 2544, 105 L.Ed.2d 342 (1989); Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 55-56, 108 S.Ct. 876, 881-82, 99 L.Ed.2d 41 (1988). Second, though the New York statute deters the publication of crime accounts by those who commit or are only accused of committing crimes and will result in preventing publication of some accounts, it does not prohibit such writings. Publishers who can find people willing to have their advance royalties escrowed for five years can still publish accounts of crime written or facilitated by the accused, and victims will still be distressed by knowing that criminals have pocketed all profits remaining after claims of victims and other creditors. Finally, the "victim outrage," interest suffers from the same defect as the "victim compensation" interest--though the interest can be validly advanced by regulating all profits of crime, it cannot be advanced, consistent with the First Amendment, by singling out books of specified content for special regulation.
 
 
 45
 In addition to the fundamental vice of a content-based regulation of speech that is underinclusive, other aspects of section 632-a render it highly offensive to the First Amendment. Subsection 632-a(1) requires a publisher to submit to the Board all contracts and payments for books within the scope of the statute to be written by those accused of crime, not just those convicted. Though escrowed funds will be returned in the event of an acquittal, the statute deters, and in many cases prevents, the payment of advances for covered books to all persons accused of crime, even those later determined to be innocent. Many publishers will decline to make advance payments, rather than take the risk that the author claiming to be innocent will be convicted. From the undisputed affidavits in this case, it is clear that the prohibition of such advances will deter the writing of books by many innocent persons falsely accused of crime.
 
 
 46
 Another vice of the statute is the interpretation, applied by the Board in this case, that makes a publisher liable for any payments made to an author that are later determined to be covered by the statute in the event that the author declines to turn over the payments to the Board. That threat of a retroactive liability will make publishers extremely reluctant to make advances for books even arguably within the scope of the statute, a reluctance that, according to the undisputed affidavits, has already led to decisions not to publish books of high public interest.
 
 
 47
 Furthermore, the statute's coverage of contracts and payments for books that include only a brief reference to an author's crime or even to his "thoughts" about his crime will inevitably tend to impel publishers to purge manuscripts of all material arguably within the scope of the statute in order to escape its coverage and the risk of retroactive liability. The undisputed affidavits report that this has already occurred. Such governmentally induced suppression of speech is anathema to the First Amendment.
 
 
 48
 New York understandably wishes to make sure that crime victims receive restitution from those who perpetrate crimes. To achieve that objective New York has enacted a comprehensive restitution statute, authorizing sentencing judges in every case to order restitution. N.Y. Penal Law Sec. 60.27 (McKinney 1987). Nothing in the Constitution prevents enactment of such a comprehensive statute providing for restitution to crime victims. If that statute needs strengthening to increase its effectiveness, New York is free to adopt needed reforms. However, when New York, understandably outraged by the prospect that a criminal might profit from a book about his crime, tries to enact a victim restitution statute that applies only to protected speech, rather than all income-producing activity, and, then, only to speech of specified content, rather than all speech, it encounters First Amendment obstacles that in my judgment are insuperable.
 
 
 49
 Moreover, this statute is ill suited even to its objective of aiding victims. In the first eleven years of its operation, it has produced just five escrow accounts, three of which involved the same criminal. What little benefit to a handful of victims has thereby been achieved is more than offset by the royalties that would have been earned on books that were not published because of this statute. Such royalties would have been available for victim restitution under New York's existing restitution statute, which is not confined to books, much less to books with specified content.
 
 
 50
 The issue of how best to secure restitution for crime victims involves policy judgments for the state legislature. Whether this statute employs a technique permitted by the First Amendment, however, is an issue ultimately to be decided by the judiciary. Any statute that has the obvious effect of preventing the publication of matters of legitimate public interest is constitutionally suspect. "Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." Regan v. Time, Inc., 468 U.S. 641, 648-49, 104 S.Ct. 3262, 3267, 82 L.Ed.2d 487 (1984). We do not know how many books will not be published because of the existence of the challenged statute. Wiseguy, the book at issue in this case, and its film adaptation, GoodFellas, may not be profound additions to public understanding of crime, but they are significant contributions. The evidence is undisputed that observance of the requirements of the "Son of Sam" law when the book contract was first negotiated would have prevented the writing of this book. And its publisher does not engage in hyperbole by inviting us to consider whether it or any other firm would have published Where Do We Go From Here ? by Martin Luther King, Jr., Witness by Whitaker Chambers, or On Civil Disobedience by Henry David Thoreau, had the crimes of these authors been committed in New York State while section 632-a was in effect.
 
 
 51
 From the judgment upholding the constitutionality of section 632-a, I respectfully dissent.